UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 03 B 42061 |
| JAMES P. WHITMER, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| ) | |
| LESTER AND JUDITH MUNSON, ) | |
| ) | Adv. 03 A 4790 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Judge Pamela S. Hollis |
| JAMES P. WHITMER, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This matter comes before the court following trial on the complaint brought by Lester and Judith Munson. In the complaint, the Munsons seek a finding that the debt James Whitmer owes to them is nondischargeable under 11 U.S.C. § 523(a)(6). This court already ruled on a motion for summary judgment that the only issue for trial was whether Whitmer had the subjective knowledge that the Munsons were substantially certain to be injured by his frivolous pleadings. For the reasons stated below, the court finds that Whitmer did have the subjective knowledge that the Munsons were substantially certain to be harmed, and that since the other elements of § 523(a)(6) were satisfied at summary judgment, Whitmer's debt to the Munsons is nondischargeable. Judgment will be entered for the plaintiffs on this complaint.

## FINDINGS OF FACT

Whitmer and the Munsons are neighbors in a townhouse complex built on the Chicago River, in the 300 North block of Canal Street. On or about April 25, 1994, Whitmer sued the Munsons in the Circuit Court of Cook County. He asserted in his complaint that the Munsons interfered with his attempts to reconstruct a damaged retaining wall and to build a new boat hoist, and sought damages, attorney's fees, costs and both punitive and economic damages. The Munsons counterclaimed against him and moved for a preliminary injunction, asserting that Whitmer's construction violated the restrictive covenants governing the townhouse complex.

According to paragraph 5 of Whitmer's verified state court complaint, he "obtained permits from the City of Chicago, the Illinois Department of Transportation and the Army Corps of Engineers before beginning work on the project." When shown at trial a copy of the complaint he filed against the Munsons, even after reviewing the verification page, Whitmer denied having read the complaint and testified that he did not remember seeing the whole complaint.

Whitmer maintained in additional filings in the state court lawsuit that he had all necessary permits. In his answer to the Munsons' first amended counterclaim, Whitmer denied that "[n]o permits to construct the boat hoist have been obtained from the pertinent governmental authorities." In his amended complaint, filed on February 10, 1995, Whitmer reiterated that he "obtained permits from the City of Chicago, the Illinois Department of Transportation and the Army Corps of Engineers."

Abigail Spreyer represented the Munsons in the state court lawsuit. She testified that the trial judge, Lester Foreman, frequently commented to the parties that the fees and costs must be

mounting on both sides. He directed these comments both to counsel and to the parties themselves. Spreyer further testified that she was certain that Whitmer heard Judge Foreman's comments, because she could not recall one court hearing at which Whitmer was not present.

Settlement negotiations began almost immediately after the lawsuit commenced. On Friday, June 3, 1994, both parties worked with Judge Foreman to reach a final resolution of the matter. By 7:00 p.m. that evening it appeared that a compromise had been achieved. The parties shook hands, and Lester Munson was assigned the task of documenting the settlement. A court status hearing was scheduled for June 9, 1994, and several settlement agreement drafts were exchanged.

However, Spreyer testified that the settlement negotiations came to a "screeching halt" when she arrived at court on June 9. That day, Whitmer filed a motion requesting that the court deny the preliminary injunction sought by the Munsons on the grounds that he would no longer be constructing this particular boat hoist. Letters attached to that motion indicated that despite his statement in the verified complaint which had commenced the action against the Munsons, Whitmer had never actually obtained any permits for his construction project.

There are seven letters dated June 9, 1994, which are attached to Whitmer's motion to deny preliminary injunction. Each was drafted by the Vice President of Pile Dyne, Inc., Whitmer's agent for his construction project, and each requested of a different government agency that it stop the permit approval process while Whitmer amended his application. The letters are addressed to: the Department of the Army, Chicago District Corps of Engineers; the Illinois Department of Transportation, Division of Water Resources; the City of Chicago, Department of Transportation; the Illinois Environmental Protection Agency, Division of Water

Pollution Control; the U.S. Fish and Wildlife Service; the Illinois Historic Preservation Agency; and the City of Chicago, Board of Underground.

Shortly after receiving the motion to deny the preliminary injunction, on June 21, 1994, the Munsons filed their first request for sanctions against Munson. Whitmer eventually withdrew his complaint. The sanctions motion was denied at the trial level, but an appellate panel reversed and remanded with directions to determine the proper amount of sanctions. Judge Deborah Dooling took testimony on remand and entered an order on August 14, 2003, awarding the Munsons $160,196.25 in attorney fees and $13,056.89 in costs.

At trial in this court, Whitmer testified that he did not know that filing a lawsuit against the Munsons would cause them to incur costs. He knew that the Munsons were attorneys, and assumed that as a result they would not have to pay for legal counsel. However, he also testified that he remembered attorney Abigail Spreyer appearing for the Munsons at the first court hearing, and he knew that she was representing the Munsons. Whitmer's own attorney in the state court lawsuit, Jewel Klein, testified that her firm regularly billed Whitmer for its services, and that the firm also sought reimbursement of out-of-pocket expenses in its monthly bills.

Whitmer has been involved in several lawsuits over the years, in addition to the litigation with the Munsons. In the 1980s, Whitmer was sued for $237,000 by an insurance company with which he had done some business. He engaged an attorney to defend him, and paid that attorney a flat fee. In March 1994, Whitmer sued Transamerica, seeking coverage under his homeowners policy. Also in 1994, he filed a small claims lawsuit against Galaxy Terminal in the Circuit Court of Cook County. In 1995, Whitmer filed a petition for redetermination of tax deficiency, and paid a law firm a flat fee to handle that matter.

In 1996, Whitmer was sued by Donald McCann, with whom he was involved in a dispute regarding a house in Cleveland, Ohio. One of Whitmer's insurance clients represented him in the McCann lawsuit for free. Whitmer acknowledged at trial that he likely would have had to pay an attorney to represent him had he not received the free representation. Whitmer also testified that litigation causes aggravation for the parties involved.

Norman-David Fischer performed carpentry work for Whitmer in 1989, and again from 1994 through spring 1997. Beginning in early February 1994, Fischer was at Whitmer's residence on an almost daily basis, for approximately eight hours per day. From time to time, Whitmer discussed with Fischer his pending litigation against the Munsons. Whitmer told Fischer that Lester Munson was trying to stop his construction project, but that by filing the lawsuit Whitmer would be able to frustrate Munson's intentions. Whitmer believed that Munson could not afford to fight him in court. By entangling Munson in litigation, Whitmer would be able to stop him from delaying Whitmer's construction project.

At one point in the state court litigation, the Munsons were required to post a bond. Whitmer told Fischer that he did not think the Munsons could afford to post the bond. Fischer testified that Whitmer was "shocked" and "upset" when Munson was able to post the bond.

Whitmer filed his petition for relief under Chapter 11 on October 14, 2003. The Munsons filed this adversary proceeding on December 23, 2003, seeking a finding that their state court sanctions judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

## LEGAL DISCUSSION

Standard for Nondischargeability Under § 523(a)(6)

Pursuant to § 523(a)(6), a debt is nondischargeable if it is "for willful and malicious injury by the debtor to another entity or to the property of another entity." In order to prevail in this proceeding, the Munsons must prove by a preponderance of the evidence that (1) Whitmer caused an injury; (2) his actions were willful; and (3) his actions were malicious. French Kezelis & Kominiarek, P.C. v. Carlson, 2000 WL 226706, *3 (N.D. Ill. Feb. 22, 2000), aff'd, 2001 WL 1313652 (7th Cir. Oct. 23, 2001). This court has already found in ruling on the Munsons' motion for summary judgment that Whitmer caused an injury to the Munsons.

Section 523(a)(6) requires not just that the debtor cause an injury, but that his actions be willful and malicious. The Supreme Court has clarified the meaning of this subsection, stating that "only acts done with the actual intent to cause injury" come within its scope. Kawaahau v. Geiger, 523 U.S. 57, 61 (1998). In other words, "[t]he injury itself must be deliberate or intentional," not just the act that caused the injury. In re Bailey, 197 F.3d 997, 1000 (9th Cir. 1999).

Although the Supreme Court did not define the scope of the term "intent" in Geiger,

> [r]ecent decisions . . . have found that either a showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts can establish the requisite intent required in Geiger.

Rae v. Scarpello (In re Scarpello), 272 B.R. 691, 704 (Bankr. N.D. Ill. 2002) (citations omitted). See also Kenna v. Lee (In re Lee), 304 B.R. 344, 349 (Bankr. N.D. Ill. 2004).

Consequently, under the two definitions of intent identified in Scarpello, the Munsons can prevail either by showing that Whitmer had the subjective intent to injure them, or by

showing that when he filed his frivolous pleadings, Whitmer had the subjective knowledge that injury to them was substantially certain to result.

On summary judgment the court considered first whether Whitmer had the subjective intent to injure the Munsons. The court reviewed the record from the state court lawsuit, including this statement from Judge Foreman:

> I don't think the lawsuit was brought to harass the Munsons. I think it was brought because Mr. Whitmer wanted to avail himself of the benefit of having a residence along the river. I can't forget the fact that he was the first one to live on these premises.

Consequently, this court determined at summary judgment that the Munsons were collaterally estopped from showing that Whitmer had the subjective intent to injure them when he filed his baseless lawsuit.

Whitmer now asserts that since the trial court found that he did not bring his lawsuit to harass the Munsons, the award of damages to the Munsons under Rule 137 must have been issued only to protect the integrity of the judicial system and to deter other litigants from similar actions. Whitmer further argues that sanctions must be nondischargeable only where they were awarded following a finding by the state court that the debtor acted tortiously. For example, in French Kezelis, the state court explicitly found that debtor's purpose for filing the lawsuit was "to harass or get even." In re Carlson, 224 B.R. 659, 662 (Bankr. N.D. Ill. 1998).

However, this argument ignores the second definition of intent identified by Scarpello. Even if a debtor did not have the subjective intent to injure, a plaintiff can prevail under § 523(a)(6) by proving "a debtor's subjective knowledge that injury is substantially certain to result from his acts." Scarpello, 272 B.R. at 704. Although the state trial court made a determination that Whitmer did not bring his lawsuit with the intent to harass the Munsons, it did

-7-

not consider the issue of whether Whitmer knew that injury to the Munsons was substantially certain to result when he filed frivolous pleadings.

Since the state court did not consider it, this court set for trial the issue of whether Whitmer had the subjective knowledge that the Munsons were substantially certain to be injured by his frivolous pleadings. Based on the testimony received at trial and the court's review of the exhibits admitted into evidence, the court finds that plaintiffs have shown by a preponderance of the evidence that Whitmer subjectively knew that when he filed his frivolous lawsuit, the Munsons were substantially certain to sustain injury.

Whitmer was called on direct by the Munsons, and much of this testimony was self-serving and difficult to believe. For example, Whitmer was asked whether he knew that filing a lawsuit against the Munsons would cause them to incur costs. He stated, "I didn't know that it would cost them money." Yet, he himself agreed to pay an attorney to represent him in the case. That attorney, Jewel Klein, testified that her firm regularly billed Whitmer for its services based on the attorneys' hourly rates, and that the firm also sought reimbursement of out-of-pocket expenses in its monthly bills.

Whitmer testified that he knew the Munsons were attorneys, and so assumed that they would not have to pay for legal counsel. However, he also testified that he remembers Abigail Spreyer appearing for the Munsons at the first court hearing, and he knew that she was representing the Munsons.

Whitmer has been involved in several lawsuits, in addition to the litigation with the Munsons. In the 1980s, Whitmer was sued by an insurance company with which he had done some business. He engaged an attorney to defend him, and paid that attorney a flat fee. In

March 1994, Whitmer sued Transamerica, seeking coverage under his homeowners policy. Also in 1994, he filed a small claims lawsuit against Galaxy Terminal in the Circuit Court of Cook County. In 1995, Whitmer filed a petition for redetermination of tax deficiency, and paid a law firm a flat fee to handle that matter.

In 1996, Whitmer was sued by Donald McCann, with whom he was involved in a dispute regarding a house in Cleveland, Ohio. One of Whitmer's insurance clients represented him in the McCann lawsuit for free. Whitmer acknowledged at trial that he likely would have had to pay an attorney to represent him had he not received the free representation. Whitmer also testified that litigation causes aggravation for the parties involved. Based on his litigation experience, it is disingenuous and self-serving for Whitmer to claim that he did not know that filing a lawsuit against the Munsons would cause them to incur costs.

When shown a copy of the complaint he filed against the Munsons, which sought damages, attorney's fees, costs and both punitive and economic damages, Whitmer testified that he did not remember seeing the whole complaint. Even when he was shown the verification page, where he signed to verify that all of the allegations in the complaint were true, Whitmer still denied having read the complaint. While he may have been attempting to disclaim knowledge that he had sworn he had obtained all necessary permits, Whitmer succeeded only in establishing that he cannot be believed.

Fischer's testimony against Whitmer was particularly incriminating. According to Fischer, as the result of a visit by the City of Chicago to inspect his property, Whitmer believed that Lester Munson was trying to stop his construction project. Whitmer also told Fischer that by filing a lawsuit he could frustrate Lester Munson's intentions, because he believed that Lester

-9-

Munson could not afford to fight him in court. Therefore, if Whitmer sued Munson, he could get him to back down and stop opposing Whitmer's project. So Whitmer clearly had the subjective knowledge that involving the Munsons in a lawsuit would cause them to incur costs.

At one point in the state court litigation, the Munsons were required to post a bond. Whitmer told Fischer that he didn't think the Munsons could afford it. According to Fischer, Whitmer was "shocked" and "upset" when Munson was able to post the bond.

The court finds Fischer to be a very believable witness. He appeared pursuant to a trial subpoena, and had an appropriate demeanor. Despite the information that came out on cross-examination that Fischer and Whitmer have since sued each other – a lawsuit that Fischer believes has concluded – the court finds Fischer's testimony to be credible. While one might be skeptical that a homeowner would confide his suspicions about a neighbor to a contractor, Fischer was neither a day worker nor a temporary contractor. He was a constant presence at Whitmer's residence for more than three years. It is highly likely that they spoke on a regular basis, and not at all unusual that the topic of some of their conversations was the litigation in which Whitmer was deeply involved.

Additionally, Spreyer testified that the state court trial judge, Lester Foreman, frequently commented to all concerned that the fees and costs must be mounting on both sides. He directed these comments both to counsel and to the clients. She was certain that Whitmer, who attended virtually every court hearing, heard Judge Foreman's comments. Based on all of the submitted evidence and the testimony of the witnesses, Whitmer could not have been unaware that the Munsons would suffer financially from the state court litigation.

Since he knew that the litigation would cause the Munsons to incur costs, the court will consider whether Whitmer's pleadings were frivolous. Whitmer swore in his complaint that he had "obtained permits from the City of Chicago, the Illinois Department of Transportation and the Army Corps of Engineers before beginning work on the project." He denied at trial that he had actually read the complaint, despite being shown the verification page. Based on Whitmer's level of involvement in the state court litigation, the court finds Whitmer's claim of ignorance difficult to believe.

Although he swore in the complaint that he had the proper permits, in his motion to deny preliminary injunction, filed less than six weeks later, Whitmer attached letters demonstrating that he had asked various government agencies to halt their permit approval process while he submitted amended applications. Since the permit approval process was still ongoing, Whitmer's averment in his original complaint that he had obtained the proper permits must have been false. Nevertheless, Whitmer continued to maintain that he had the permits, both in his answer to the Munsons' first amended counterclaim, filed in December 1994, and in his amended complaint, filed on February 10, 1995.

The logical inference to draw from Whitmer's false pleadings is that he was determined to drag out the legal battle as long as possible in order to overcome the Munsons' objections to his construction project. In light of Whitmer's familiarity with litigation and its costs, as well as his comments to Fischer that he believed that Lester Munson could not afford to fight him in court, the court concludes that Whitmer did have the subjective knowledge that the Munsons were substantially certain to be harmed by his frivolous pleadings.

## CONCLUSION

Since the other elements of § 523(a)(6) were satisfied at summary judgment, Whitmer's debt to the Munsons is nondischargeable. Judgment will be entered for the plaintiffs on this complaint.

Date: __APR 27 2005__  _____
PAMELA S. HOLLIS
United States Bankruptcy Judge